54 Cal.Rptr.3d 535 (2007)
146 Cal.App.4th 1332
The PEOPLE, Plaintiff and Respondent,
v.
Vince Vinthuong NGUYEN, Defendant and Appellant.
No. H028798.
Court of Appeal of California, Sixth District.
January 22, 2007.
*536 Mary J. Greenwood, Public Defender, Seth Flagsberg, Deputy Public Defender, for Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Laurence K. Sullivan, Supervising Deputy Attorney General, Eric D. Share, Supervising Deputy Attorney General, for Respondent.
McADAMS, J.
The sole issue in this appeal is whether it is constitutional to use juvenile adjudications to increase the maximum punishment for an offense, in light of the United States Supreme Court's opinions in Apprendi v. New Jersey (2000) 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (Apprendi) and Blakely v. Washington (2004) 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403 (Blakely). In concluding that it is not, we respectfully disagree with our colleagues on this court and others, and join the small but growing number of courts across the country that have likewise concluded that Apprendi and its progeny compel us to recognize that the Sixth Amendment right to a jury trial is an integral part of the process that is due before a prior conviction may be used to increase the maximum sentence for a criminal offense. However, because defendant's juvenile adjudication is based on his admission in juvenile court, his sentence is not affected by our holding today, and the judgment is affirmed.

STATEMENT OF THE CASE AND FACTS
In December 2004 a complaint was filed charging 21-year-old defendant Nguyen with four felony counts: possession of a firearm by a felon; possession of ammunition by a felon, possession of a billy, and possession of methamphetamine. (Pen. Code, §§ 12021, subd. (a)(1), 12316, subd. (b), 12020, subd. (a)(1); Health & Saf. Code, § 11377, subd. (a).) The complaint also alleged two misdemeanor counts, being under the influence of a controlled substance and possession of a device for the same. (Health & Saf.Code, §§ 11550, 11364.) Finally, the complaint alleged, under the Three Strikes law, that defendant had suffered a juvenile adjudication for assault with a deadly weapon with infliction of great bodily injury. (Pen.Code §§ 667, subds. (b)-(i), 1170.12, 245, subd. (a)(1), 12022.7, subd. (a).) Pursuant to a negotiated disposition, defendant pleaded no contest to one felony (Pen.Code 12021, subd. (a)(1)) and one misdemeanor (Pen. Code § 12020, subd. (a)(1)) and the remaining counts were dismissed.
Following a court trial, the allegation pertaining to defendant's prior juvenile adjudication was found true on the basis of documentary evidence submitted to the court.[1] Over defendant's objection *537 that use of a prior juvenile adjudication to increase his sentence violated his Sixth Amendment right to a jury trial, defendant was sentenced to 30 months in prison, double the mitigated term, pursuant to the two strike provisions of the Three Strikes law.

The Juvenile Adjudication
In December 1999 an original petition (No. 117308) filed pursuant to Welfare and Institution Code section 602, accused defendant, then 16 years old, of aggravated assault with a knife and a crowbar and inflicting great bodily injury on the victim. (Pen.Code §§ 245, subd. (a)(1), 12022.7.) The petition further alleged that defendant was not "a fit and proper subject to be dealt with under the juvenile court law, and the People [would] move the court to so order." However, in January 2000, defendant admitted only to a violation of Penal Code section 245, subdivision (a)(1). Although alternative placements were sought for him, none were found, and his disposition consisted entirely of juvenile hall detention.

DISCUSSION

The Historical Background
At English common law prior to 1854, juveniles charged with crimes were either tried as adults with the right to jury trial, or were not tried at all. With Parliament's enactment of the Youthful Offenders Act in that year, juveniles lost their jury trial rights in cases of minor crimes such as petty theft, but retained the right in felonies. (In re Javier A (1984) 159 Cal. App.3d 913, 940, fn. 18, 206 Cal.Rptr. 386; see also Comment, California's Three Strikes LawShould a Juvenile Adjudication Be a Ball or a Strike? (1995) 32 San Diego L.Rev. 1297, 1308-1309, citing Javier A; Note, Juvenile Strikes: Unconstitutional Under Apprendi and Blakely and Incompatible with the Rehabilitative Ideal (2005) 15 So. Cal. L.Rev. & Women's Stud. 171, 174; Comment, Prior `Convictions' Under Apprendi: Why Juvenile Adjudications May Not Be Used to Increase An Offender's Sentence Exposure if They Have Not First Been Proven to a Jury Beyond a Reasonable Doubt (2004) 87 Marq. L.Rev. 573, 583.)
In 1899, Illinois created the first juvenile justice system in the United States. (Juvenile Strikes, supra, 15 So. Cal. L.Rev. & Women's Stud. 171; Prior Convictions under Apprendi supra, 87 Marq. L.Rev. 573.) "This new system was premised on the idea that because of their young age, children were either less culpable for their wayward actions or not culpable at all. With the proper resources and guidance, progressives believed children were still young and impressionable enough to reform before they turned toward a life of crime. However, to accomplish this end, the state, as parens patriae, needed to commence a civil action against the juvenile's parents to gain superior custody rights. Because it was a civil proceeding, custody, not liberty, was at issue. Children could not be found guilty or innocent; they could only be found delinquent. The main function of the proceeding was not to frame the state and the child as adversaries, but `"to feel that [the child] is the object of [the state's] care and solicitude."' Finally, the purpose of sanctions would be for therapeutic and rehabilitative purposes, not for retribution or incapacitation." (Prior Convictions Under Apprendi at pp. 584-585, fns. omitted.)
Under this benevolent regime, juveniles had no need of, and no right to, notice of the charges, an attorney, the presumption *538 of innocence, right against self-incrimination, right to present and cross-examine witness, or the right to appeal. (Note, But I Was Just a Kiel! Does Using Juvenile Adjudications to Enhance Adult Sentences Run Afoul of Apprendi v. New Jersey? (2005) 26 Cardozo L.Rev. 837, fn. 1, 843, fn. 40 (hereafter Kid).) Over the next 70 years, however, it became increasingly clear that "the absence of procedural protections exposed juveniles to an unpredictable justice system that fell short of its rehabihtative goals." (Id at p. 837, fn. omitted.) As a result, beginning in the mid-1960's, the United States Supreme Court issued a series of decisions[2] that promised juveniles virtually all of the procedural rights and protections to which they would have been entitled if they were adultsnotice, counsel, the privilege against self-incrimination, confrontation, the presumption of innocence and proof beyond a reasonable doubt, double jeopardysave one: the right to a jury trial. In McKeiver v. Pennsylvania (1971) 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647, the Court concluded that "despite disappointments of grave dimensions" the juvenile court system still held the promise of,"accomplish[ing] its rehabihtative goals," and that by "imposing the jury trial" requirement in juvenile cases the Court would impede the states'"experimentation" with "new and different ways" to solve "the problems of the young." (Id at p. 547, 91 S.Ct. 1976)
The McKeiver court identified 13 reasons for its conclusion, but three ideas were central to its holding. First and foremost was the court's concern that the injection of the jury trial into the juvenile court system would "bring with it into that system the traditional delay, the formality, and the clamor of the adversary system," would "put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding" and would threaten if not destroy "every aspect of fairness, of concern, of sympathy, and Of paternal attention that the juvenile court system contemplates." (McKeiver v. Pennsylvania, supra, 403 U.S. at pp. 545, 550, 91 S.Ct. 1976.)
Second, the court was reluctant to tread where "28 States and the District of Columbia," as well as the Task Force Report on juvenile delinquency and youth crime, commissioned by the President, had not. (McKeiver v. Pennsylvania, supra, 403 U.S. at pp. 548, 91 S.Ct. 1976.) The lack of legislative and executive branch support for a jury trial in juvenile court, in turn, informed the third important consideration: that jury trials were neither appreciably more reliable than court trials nor "a necessary part even of every criminal process that is fair and equitable.*' (Id. at p. 547, 91 S.Ct. 1976, citing Duncan v. Louisiana (1968) 391 U.& 145,149-150, fn. 14,88 S.Ct. 1444,20 L.Ed.2d 491.)[3]

*539 The Statutory Framework

Formerly, section 502 of Welfare and Institutions Code[4] (since repealed) provided that the purposes of the Juvenile Court Law were to "`secure for each minor ... such care and guidance, preferably in his own home, as will serve the ... welfare of the minor and the best interests of the State; ... and when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents.'" (In re Aline D. (1975) 14 Cal.3d 557, 562, 121 Cal.Rptr. 816, 536 P.2d 65.) It has been replaced by section 202,[5] whose "new provisions recognized punishment as a rehabilitative tool [and] shifted its emphasis from a primarily less restrictive alternative approach oriented towards the benefit of the minor to the express protection and safety of the public." (In re Teofilio A (1989) 210 Cal.App.3d 571, 576, 258 Cal. Rptr. 540, internal quotation marks omitted.) Despite this shift in emphasis, California courts have continued to view rehabilitation as "an important objective of the *540 juvenile court law.', (Ibid.; see also In re Charles G. (2004) 115 Cal.App.4th 608, 614-615, 9 Cal.Rptr.3d 503 ["The purpose of juvenile delinquency laws is twofold: (1) to serve the `best interests' of the delinquent ward by providing care, treatment, and guidance to rehabilitate the ward and `enable him or her to be a law-abiding and productive member of his or her family and the community,' and (2) to `provide for the protection and safety of the public
It remains true as a matter of statutory law that "[a]n order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding." (§ 203.) Moreover, juvenile court dispositions "can range from being sent home with his or her parents" to juvenile hall detention, to camp, or ranch, "to being committed until age twenty-five in a detention facility operated by the California Department of Youth Authority" or, under certain circumstances, even adult detention facilities. (Notes & Comments, "Should Little Joey's Juvenile Adjudication Be Used Against Him When He Becomes Joe the Habitually Violent Felon?" (2005) 25 J. Juv, L. 45, 46; In re Charles G., supra, 115 Cal.App.4th at p. 613, 9 Cal.Rptr.3d 503.) ...
Consistent with section 203, California courts, construed Imposition 8, the Crime Victims' Bill of Rights,[6] as excluding juvenile adjudications from the definition of "any prior conviction of any person in, any criminal proceeding, whether adult or juvenile" and prohibited their use as enhancements under Penal Code section 667. (Cal. Const., art. .1, § 28, subd. (f); People v. West (1984) 154 Cal.App.3d 100, 201 Cal.Rptr. 63; see also In re Anthony R. (1984) 154 Cal.App.3d 772, 201 Cal.Rptr. 299 [Pen.Code § 666]; see generally, Comment, "California's Three Strikes Law Should a Juvenile Adjudication Be a Ball or a Strike? " (1995) 32 San Diego L.Rev. 1297.)' Thus, despite cries that "the California juvenile court system has now evolved into a specie of `criminal prosecution,' " until the passage of the Three Strikes law, a clear line was drawn between juvenile adjudications and prior convictions. (In re Javier A, supra, 159 Cal. App.3d at p. 967,206 Cal.Rptr. 386.)
Unlike Proposition 8, the Three Strikes law explicitly defines a juvenile adjudication as a prior conviction for enhancement purposes when four conditions are met: (1) the prior offense was committed when the juvenile was 16 years old or older; (2) the offense is listed in section 707, subdivision (b), or as a violent felony in Penal Code section 667.5 or as a serious felony in. Penal Code section 1192.7; (3) the juvenile was found to be a "fit and proper subject" for the juvenile court system (§ 707, subd. (a)(2)(e)), and (4) the juvenile was adjudged a ward of the juvenile court pursuant to section 602 because he or she committed an offense listed in section 707, subdivision (b). (Pen.Code §§ 667, subd. (d)(3), 1170.12, subd. (b)(3); People v. Garcia (1999) 21 Cal.4th 1, 87 Cal.Rptr.2d 114, 980 P.2d 829.) Under Proposition 21, the Gang Violence and Juvenile Crime Prevention Initiative, which amended section 707, subdivision (d), the prosecution, may choose to bypass the juvenile court entirely and file criminal charges against a juvenile in adult court, as long as the juvenile is at least 16 years old and the crime is one *541 listed in section 707, subdivision (b), or the minor is 16 and has previously been adjudged a ward of the court for committing certain enumerated offenses, or as long as *he minor is at least 14 and certain other circumstances exist. (See § 707, subds. (d)(1), (d)(2)(A)-(C) & (d)(S)(A)-(C); Manduley v. Superior Court (2002) 27 Cal.4th 887A, 117 Cal.Rptr.2d 168,41 P.3d 3.)
This seemingly inexorable push to blur the line between juvenile adjudications and prior criminal convictions, culminating in the Three Strikes law and Proposition 21, raises constitutional concerns at this time because of the United States Supreme Court's recent decisions interpreting the jury trial right enshrined in the federal constitution's Sixth Amendment. In Apprendi the Supreme Court held that, except for the fact of a prior conviction, any fact used to impose on a criminal defendant a greater punishment than the statutorily-set maximum punishment must be pleaded and proven to a jury beyond a reasonable doubt. As the Supreme Court of Louisiana has so genteelly phrased it, "following Apprendi there are two reasonable schools of thought on whether juvenile adjudications, in which the juvenile did not have the right to a jury trial, can properly be characterized as `prior convictions' for felony sentence enhancement purposes." (State v. Brown (La.2004) 879 So.2d 1276, 1285, fn. omitted.) To understand the division of views in the emerging case law, it is necessary to first review the salient features of the United States Supreme Court's cases that have taken us to this divide.

Almendarez-Torres, Jones, Apprendi, Ring, Blakely and Booker
In Almendarez-Torres v. United States (1998) 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (Almendarez-Torres), the Supreme Court construed a federal statute that prescribed a maximum prison sentence of two years for an illegal immigration offense, but authorized a maximum sentence of 20 years if the defendant had suffered certain prior convictions. (Id. at p. 229, 118 S.Ct. 1219.) Almendarez-Torres pleaded guilty to an indictment that alleged a violation of the statute, but did not mention a prior conviction. At the hearing on his change of plea, he admitted that he had been deported, had unlawfully re-entered the United States, and had suffered three earlier convictions. (Id at p. 227, 118 S.Ct. 1219.) At sentencing, Almendarez-Torres argued that he could not be sentenced to more than two years in prison because "an indictment must set forth all the elements of a crime" and his indictment had not mentioned his earlier convictions. (Ibid.) The district court disagreed and sentenced Almendarez-Torres to 85 months pursuant to the sentencing guidelines. Following an unsuccessful appeal of his sentence, the United States Supreme Court granted certiorari.
After finding that Congress intended to treat the prior conviction allegation as a "sentencing factor" for the court's determination rather than as an element of a separate offense, the Supreme Court rejected defendant's claim that "the Constitution requires Congress to treat recidivism as an element of the offenseirrespective of Congress' contrary intent," and mandates that "[t]he indictment must state the `element[,]' [t]he Government must prove that `element' to a jury[,] [a]nd the Government must prove the `element' beyond a reasonable doubt." (Almendarez-Torres, supra, 523 U.S. at p. 239, 118 S.Ct. 1219, citations omitted.)
The court articulated four major reasons and several lesser considerations for its rejection of that claim. First, the court recited that recidivism "is a traditional, if not the most traditional, basis for a sentencing *542 court's increasing an offender's sentence." (Almendarez-Torres, supra, 523 U.S at p. 243, 118 S.Ct. 1219.) Consistent with that tradition, the court had never required the State to allege the defendant's convictions in the indictment or information, because "recidivism does not relate to the commission of the offense, but goes to the punishment only, and therefore ... may be subsequently decided." (Id at p. 241, 118 S.Ct. 1219, internal quotation marks omitted.) "[T]o hold that the Constitution, requires that recidivism be deemed an `element' of petitioner's offense would mark an abrupt departure from [that] longstanding tradition." (Ibid.)
Second, the court did not perceive that the difference between a mandatory minimum sentenceheld constitutional in McMillan v. Pennsylvania (1986) 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67and a permissive maximum sentence, "work[ed] to the disadvantage of a criminal defendant." (Almendarez-Torres, supra, 523 U.S. at p. 244,118 S.Ct. 1219.) "[T]herisk of unfairness to a particular defendant is no less, and may well be greater, when a mandatory minimum sentence, rather than a permissive maximum sentence, is at issue." (Id at p. 245,118 S.Ct. 1219.)
Third, the breadth of the permissive sentencing rangefrom two years to 20 did not "itself create significantly greater unfairness," and it was not unusual for judges and parole boards to exercise their discretion within broad statutory ranges. The court particularly noted that the federal sentencing guidelines channeled judicial discretion using "`sentencing factors'" that no one challenged as unconstitutional. (Almendarez-Torres, supra, 523 U.S. at pp. 245-246,118 S.Ct. 1219.)
Finally, the court noted that the statute did not change a pre-existing definition of a well-established crime or give rise to the inference that Congress intended to "evade" the Constitution by "presuming'' guilt or "restructuring'' the elements of an offense. In addition, "adopt[ing] a rule that any significant increase in a statutory maximum sentence would trigger a constitutional `elements' requirement" appeared to be "anomalous" in light of Walton v. Arizona (1990) 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (Walton) and other cases that permitted a judge and not the jury to decide the existence of factors that can make a defendant death eligible. (Almendarez-Torres, supra, 523 U.S. at pp. 246, 247,118 S.Ct. 1219.)
The following term, in Jones v. United States (1999) 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (Jones), the U.S. Supreme Court construed the federal car-jacking statute which provides for an enhanced sentence if serious bodily injury occurs during the commission of the offense. Jones had been charged with carjacking, and a jury convicted him of that offense. Seriously bodily injury was not alleged in the indictment or tried to the jury. Following an evidentiary hearing, the court found by a preponderance of the evidence that serious bodily injury had occurred and, over the defendant's constitutional objections, sentenced Jones to 25 years in prison10 years more than the maximum sentence prescribed by the statute for carjacking as tried to the jury.
On certiorari, the court declined to construe the "serious bodily harm" allegation as a "sentencing factor" subject to judicial fact-finding by a preponderance of the evidence. (Jones v. United States, supra, 526 U.S. at p. 239, 119 S.Ct. 1215.) Citing the history of the jury trial right at English common law and "the Framers' conception of the jury right," and expressing concern about the "erosion of the jury's function," the court perceived that such a construction would open the statute "to constitutional *543 doubt in light-of-a series of cases over the past quarter century, dealing with due process and the guarantee of trial by jury." (Id. at pp. 244,239,119 S.Ct. 1215.) Thus, the court construed "serious bodily harm" as an element of the offense, invoking the rule that "`where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'" (Id, at p. 239,119 S.Ct. 1215.)
The Jones majority rejected the dissenters' argument that Almendarez-Torres "stood for the broad proposition that any fact increasing the maximum permissible punishment may be determined by a judge by a preponderance," and was therefore dispositive of the due process and jury trial issues before the court. Instead, the Jones court stated, Almendarez-Torres "stands for the proposition that not every fact expanding a penalty range must be stated in a felony indictment, the precise holding being that recidivism increasing the maximum penalty need not be so charged." (Jones v. United States, supra, 526 U.S. at pp. 248, 249, fn. 10, 119 S.Ct. 1215.) The Jones court observed that Almendarez-Torres "rested in substantial part on the tradition of regarding recidivism as a sentencing factor" and suggested that recidivism might be "distinguishable for constitutional purposes from other facts that might extend the range of possible sentencing." (Id at p. 249, 118 S.Ct. 1219.) Jones further observed that "[o]ne basis for that possible constitutional distinctiveness is not hard to see: unlike virtually any other consideration used to enlarge the possible penalty for an offense, and certainly unlike the factor before us in this case, a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt and jury trial guarantees." (Id. at p. 249, 119 S.Ct. 1215.)
One year later, in Apprendi, the court explicitly held that the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Sixth Amendment's notice and jury trial guarantees, require that "any fact (other than [the fact of a] prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." (Apprendi supra, 530 U.S. at p. 476, 120 S.Ct. 2348.) The court characterized the jury trial right as a constitutional protection "of surpassing importance." (Id. at pp. 476-477, 120 S.Ct. 2348.) Its conclusion, the court said, was "foreshadowed" by its opinion in Jones. (Id. at p. 476, 120 S.Ct. 2348.)
In Apprendi the defendant fired several shots into a house occupied by an African American family and stated that he did so because of their race, a statement he later retracted. He was indicted on several counts of illegal firearm and bomb possession and pleaded guilty. The indictment to which he pled did not refer to New Jersey's hate crime statute, nor did it allege that Apprendi acted with racially biased purpose. After a separate evidentiary hearing, the trial court found by a preponderance of the evidence that Apprendi had acted with a racially biased purpose.
Rejecting Apprendi's constitutional challenge to the hate crime statute, the trial court enhanced his sentence from a maximum of 10 years to 12 years on one of the firearm possession counts, with lesser concurrent sentences for the remaining counts. (Apprendi supra, 530 U.S. at p. 471, 120 S.Ct. 2348.) The Apprendi court described this procedure as "an unacceptable departure from the jury tradition that is an indispensable part of our criminal *544 justice system." (Id at p. 497, 120 S.Ct. 2348.)
Exploring anew the historical roots of the jury trial right and referencing its discussion of that history in Jones, the court asserted that "[a]ny possible distinction between an `element' of a felony offense and a `sentencing factor was unknown" to the Framers. (Apprendi, supra, 530 U.S. at p. 478, 120 S.Ct 2348.) At common law, "[t]he defendant's ability to predict with certainty the judgment from the fact of the felony indictment flowed from the invariable linkage of punishment with crime." (Id. at p. 478, 120 S.Ct. 2348.) `Tie historic link between verdict and judgment" compelled the conclusion that, "[t]he judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, the facts that expose a defendant to a punishment greater than otherwise legally prescribed were by definition `elements' of a separate legal offense." (Id at pp. 482, 483, fn. 10, 120 S.Ct. 2348.) In fact, "[i]t was in McMillan v. Pennsylvania, [supra,] 477 U.S. 79[, 106 S.Ct. 2411], that this Court, for the first time, coined the term `sentencing factor" to refer to a fact that was not found by a jury but that could affect the sentence imposed by the judge." (Id at p. 485, 120 S.Ct. 2348.)
The court stated that it had "made clear beyond peradventure that Winship's due process and assorted jury protections extend, to some degree, to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence." (Apprendi supra, 530 U.S. at p. 484, 120 S.Ct. 2348, internal quotation marks omitted, italics added.) The court limited its holding in McMillanthat a judge could constitutionally determine by a preponderance of the evidence the existence of statutorily selected sentencing factors that set a minimum sentence"to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict>-limitation identified in the McMillan opinion itself." (Apprendi, at p. 487, fn. 13, 120 S.Ct. 2348.)
Distinguishing Almendarez-Torres, the court stated that it had "made plain in Jones ... [that] Almendarez-Torres ... represents at best an exceptional departure from the historic practice that we have described." (Apprendi supra, 530 U.S. at p. 487, 120 S.Ct. 2348.) Jones had also made it "crystal clear" that the conclusion reached in Almendarez-Torres "turned heavily upon the fact that the additional sentence to which the defendant was subject was the prior commission of a serious crime' "recidivisma traditional sentencing factor. (Apprendi, at p. 488, 120 S.Ct. 2348, italics added.) "Both the certainty that procedural safeguards attached to any `fact' of prior conviction, and the reality that Almendarez-Torres did not challenge the accuracy of that fact' in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a fact' increasing punishment beyond the maximum of the statutory range." (Id at p. 488,120 S.Ct. 2348, fn. omitted.)
Finally, recognizing that Almendarez-Torres was arguably "incorrectly decided, and that a logical application of our reasoning today should apply if the recidivist issue were contested," the court declined to reconsider Almendarez-Torres inasmuch as its validity was not directly implicated by the court's decision; instead the court opted "to treat the case as a narrow exception to the general rule [and the] otherwise uniform course of decision during the entire history of our jurisprudence." (Apprendi supra, 530 U.S. at pp. 489-490,120 S.Ct. 2348, fn.omitted.)
*545 If Apprendi left any doubts about the court's commitment to its holding, those doubts were banished by Ring v. Arizona (2002) 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (Ring) and, two years after that, Blakely, supra, 542 U.S. 296, 124 S.Ct. 2531. In Ring, the court held that "[c]apital defendants, no less than noncapital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment," ruling that a judge could not impose the death penalty on the basis of judicial fact-finding of aggravating circumstances, thereby overruling Walton v. Arizona. (Ring, at p. 589, 122 S.Ct. 2428.)
In Blakely, the statutory sentencing scheme at issue provided a "standard range" for a particular offense but authorized the judge to impose a sentence above that standard range if he or she found one or more aggravating factors to justify such a departure from the norm. In Blakely's case, the judge imposed a sentence 37 months above the standard range for the crime to which he had pleaded guilty, based upon the judge's finding that Blakely had acted with "`deliberate cruelty.'" (Blakely, supra, 542 U.S. at p. 300, 124 S.Ct. 2531.)
In finding Washington's sentencing scheme unconstitutional, the Blakely court unequivocally re-affirmed Apprendi and further explained that "the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant In other words, the relevant `statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts *which the law makes essential to the punishment' ... and the judge exceeds his proper authority." (Blakely, supra, 542 U.S. at pp. 303-304, 124 S.Ct. 2531, italics omitted.) The Blakely court stated that its commitment to Apprendi reflected "not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.... Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended." (Id. at pp. 305-306, 124 S.Ct. 2531.) The court characterized that intended control by the jury over the judiciary in our jurisprudence as a "circuitbreaker in the State's machinery of justice." (Id. at p. 306,124 S.Ct. 2531.)
Finally, in United States v. Booker (2005) 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (Booker), the court reaffirmed its "holding in Apprendi: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." (Id. at p. 244, 125 S.Ct. 738.) The court held that for Sixth Amendment purposes, there was "no relevant distinction" between the federal sentencing guidelines and the statutory scheme in Blakely: in each case, the sentence imposed was unconstitutional because "`the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional *546 fact.'" (Booker, at p. 235, 125 S.Ct. 738, quoting from Blakely, supra, 542 U.S. at p. 305, 124 S.Ct. 2531.) However, rather than invalidate the guidelines in their entirety or engraft onto them a jury trial requirement, the court concluded that by excising by the provisions of the law that made the guidelines mandatory and restricted appellate review, the guidelines could be rendered compatible with the Sixth Amendment while still preserving Congress' intent.
After Apprendi Ring, Blakely and Booker, many of the reasons supporting Almendarez-Torres' holding have evaporated. For example, in Almendarez-Torres, the court saw no constitutional difference between a mandatory minimum sentence, such as the one held constitutional in McMillan v. Pennsylvania and a permissive maximum sentence, such as the one later held unconstitutional in Apprendi However, in Apprendi the court drew a bright line between these two types of sentences and severely limited McMillan's rationale to its own facts. (Compare Almendarez-Torres, supra, 523 U.S. at pp. 244-245, 118 S.Ct. 1219; Apprendi, supra, 530 U.S. at p. 487, fn. 13, 120 S.Ct. 2348.)
Similarly, in Almendarez-Torres, the court suggested that the federal sentencing guidelines' reliance on "sentencing factors" was above constitutional reproach. (Almendarez-Toires, supra, 523 U.S. at pp. 245-246, 118 S.Ct. 1219.) Yet, in Booker, the court found that the federal sentencing guidelines were as constitutionally infirm as the statutory scheme found wanting in Blakely. (Booker, supra, 543 U.S. at p. 235,125 S.Ct. 738.)
Finally, in Almendarez-Torres, the court deemed the constitutional pleading and proof requirements advanced by the defendant "anomalous" in light of Walton's rule permitting judges alone to decide death determinative factors in capital cases. (Almendarez-Torres, supra, 523 U.S. at pp. 246-247, 118 S.Ct. 1219.) But in Ring, the court overruled Walton, rendering its rule the anomaly. (Ring, supra, 536 U.S. at p. 589, 122 S.Ct. 2428.) The end result is that the sole rationale for Almendarez-Torres" holding left standing is the tradition of recidivism, and the related distinction between sentence-enhancing factors that are offense-specific facts and sentence-enhancing prior convictions. Not surprisingly, the tension between Almendarez-Torres, on the one hand, and Apprendi and its progeny, on the other, has divided the lower courts on the question of whether juvenile adjudications should be treated as if they were prior convictions.

Apprendi and Juvenile Adjudications: Two Schools of Thought
In United States v. Tighe (9th Cir. 2001) 266 F.3d 1187, a divided panel of the Ninth Circuit Court of Appeals held that a juvenile adjudication is not a prior conviction for Apprendi purposes, and therefore is not excepted from Apprendi's rule. Based on the language in Apprendi and in Apprendi's precursor, Jones, the Tighe majority determined the exception for prior convictions is a narrow one that is "limited to prior convictions resulting from proceedings that afforded the procedural necessities of a jury trial and proof beyond a reasonable doubt." (Tighe, at p. 1194, fn. omitted.) Since the criminal defendant was not afforded a jury trial when his juvenile offense was adjudicated, his juvenile adjudication does not qualify as a prior conviction for Apprendi purposes.
In his dissent, Justice Brunetti said the majority's reasoning from Jones' language to the Tighe majority's conclusion represented "a quantum leap" in logic. In his view, "the language in Jones stands for the basic proposition that Congress has the *547 constitutional power to treat prior convictions as sentencing factors subject to a lesser standard of proof because the defendant presumably received all the process that was due when he was convicted of the predicate crime. For adults, this would indeed include the right to a jury trial. For juveniles, it does not. Extending Jones' logic to juvenile adjudications, when a juvenile receives all the process constitutionally due at the juvenile stage, there is no constitutional problem (on which Apprendi focused) in using that adjudication to support a later sentencing enhancement," (United States v. Tighe, supra, 266 F.3d at p. 1200.) This dissenting view was. adopted by the Eighth Circuit in United States v. Smalley (8th Cir.2002) 294 F.3d 1030, cert, denied (2003) 537 U.S. 1114, 123 S.Ct 870, 154 L.Ed.2d 790. Smalley was followed by the Third Circuit in United States v. Jones (3rd Cir.2003) 332 F.3d 688, cert, denied (2004) 540 U.S. 1150,124 S.Ct. 1145,157 L.Ed.2d 1044 and by the Eleventh Circuit in United States v. Burge (11th Cir.2005) 407 F.3d 1183, cert, denied (2005) ___ U.S. ___, 126 S.Ct. 551, 163 L.Ed.2d 467.
A number of state court opinions, including several from California, two of them from this district, have taken the same view as the Tighe dissent. (State v. Hitt (Kan.2002) 273 Kan. 224, 235, 42 P.3d 732, 739; Ryle v. State (Ind.App.2004) 819 N.E.2d 119,123, opinion vacated (Ind.2005) 842 N.E.2d 320, cert, denied (2006) ___ U.S. ___, 127 S.Ct. 90, 166 L.Ed.2d 63; People v. Bowden (2002) 102 Cal.App.4th 387, 125 Cal.Rptr.2d 513; People v. Smith (2003) 110 Cal.App.4th 1072, 1 Cal.Rptr.3d 901 (Johnson, J. cone. & dis.); People v. Lee (2003) 111 Cal.App.4th 1310, 4 Cal. Rptr.3d 642 (Rushing, P.J. dissenting), cert, denied (2004) 542 U.S. 906, 124 S.Ct. 2840, 159 L.Ed.2d 271; People v. Superior Court (Andrades) (2003) 113 Cal.App.4th 817, 7 Cal.Rptr.3d 74 (Andrades), cert, denied 543 U.S. 884, 125 S.Ct. 121, 160 L.Ed.2d 142; see also People v. Fowler (1999) 72 Cal.App.4th 581, 84 Cal.Rptr.2d 874 (Fowler) [pre-Apprendi].)
But a growing number of state courts have taken the view that Apprendi bars the use of juvenile adjudications to enhance adult sentences over and above the otherwise statutorily-set maximum. (See, e.g., State v. Brown, supra, 879 So.2d at p. 1290, cert, denied (2005) 543 U.S. 1177,125 S.Ct. 1310, 161 L.Ed.2d 161 (2005); Pinkston v. State (Ind.App.2005) 836 N.E.2d 453; State v. Chatman (Tenn.Crim.App. 2005) (unpublished) [2005 WL 901138].) Commentators are virtually unanimous in that view.[7]
*548 Against this national backdrop, and with these divisions in mind, we now examine the opinions of other California courts, including those from our own district. In doing so, we readily acknowledge that our analysis of Supreme Court precedent leads us to a different conclusion from the one reached by the other California courts which have addressed the issue before us, and we explain our disagreement with their rationale.

The California Cases
Our sister courts have relied on three central considerations in ruling that Apprendi its progeny and its precursors do not bar the use of juvenile adjudications as "strikes" under our Three Strikes law. These are: (1) recidivism is different; (2) juries add nothing to the reliability of a trial's fact-finding function; and (3) juries are not indispensable to due process in the context of sentencing above the statutory maximum.
We address separately each consideration, and explain why we conclude it does not support a holding that juvenile adjudications can constitutionally be used as strikes. Our analysis often focuses on a particular rationale as expressed in Fowler, supra, 72 Cal.App.4th 581, 84 Cal. Rptr.2d 874. Even though Fowler is a pre-Apprendi case, its reasoning has been uniformly credited as seminal by the more recent, post-Apprendi cases.

(1) Recidivism
We start with Apprendi itself which excepts, not recidivism per se,[8] but "the fact of a prior conviction" from the reach of its rule. (Apprendi supra, 530 U.S. at p. 489, 120 S.Ct. 2348.) In this state, juvenile adjudications are not convictions (§ 203) and juvenile court trials are not criminal prosecutions (ibid.), except for purposes of the Three Strikes law.
In discussing Almendarez-Torres, the source of the prior conviction exception, and in relying on its prior discussion of Almendarez-Torres in Jones, Apprendi characterized that case as "at best an exceptional departure from the historic practice" of affording jury trials on questions that affect the length of a defendant's sentence. (Apprendi supra, 530 U.S. at p. 487, 120 S.Ct. 2348.) Apprendi also said that after Jones it was "crystal clear" the conclusion reached in Almendarez-Torres had "turned heavily upon the fact that the additional sentence to which the defendant was subject was the prim commission of a serious crime' "recidivisma traditional sentencing factor. (Apprendi at p. 488, 120 S.Ct. 2348, italics added.) The Apprendi court did not overrule Almendarez-Torres, but it severely limited Almendarez-Torres to a "narrow exception" whose "unique facts" did not "warrant rejection of the otherwise uniform course of decision during the entire history of our jurisprudence." (Apprendi at p. 490, 120 S.Ct. 2348.) In light of this characterization of Almendarez-Torres by Apprendi we see the question before us as whether "prior convictions" ought to be interpreted *549 expansively to include other judgments, which are by definition not criminal or convictions, but which do reflect recidivism.
Our courts have correctly stressed that the purpose of the Three Strikes law is to "provide greater punishment for recidivists" (Fowler, supra, 72 Cal.App.4th at p. 584, 84 Cal.Rptr.2d 874) and that its focus "is on the defendant's conduct" grounded "on findings of factual guilt." (Ibid, italics added; People v. Bowden, supra, 102 CalApp.4th 387, 390, 125 Cal.Rptr.2d 513 ["the prosecution's proof of the prior juvenile adjudication showed the juvenile court found Tennant committed robbery"].) "A prior juvenile adjudication ... demonstrates beyond a reasonable doubt [citation] that a defendant has engaged in serious criminal behavior in the past [and] [b]y reoffending ... shows he has failed to draw the proper lesson from the previous judicial determination that he violated the law. This failure warrants harsher punishment in the adult proceeding." (Fowler, at p. 587, 84 Cal.Rptr.2d 874.)
Thus, the Three Strikes law is part of the legal tradition that permits courts to "consider a defendant's juvenile adjudications as evidence of past criminal conduct for the purpose of increasing an adult defendant's sentence." (Fowler, supra, 72 Cal.App.4th at p. 585, 84 Cal.Rptr.2d 874; People v. Lee, supra, 111 Cal.App.4th at p. 1312, 4 Cal.Rptr.3d 642 [quoting Fowler].) These courts cite language in Almendarez-Torres that recidivism goes to punishment only and is the most traditional basis for increasing an offender's sentence; therefore, it is distinguishable for constitutional purposes from other facts that might extend the range of possible sentencing. (Fowler, at p. 586, fn. 2, 84 Cal.Rptr.2d 874.)
As we see it, there are several problems with an uncritical acceptance of Fowler's rationale. First, the Fowler court did not appreciate the distinction, to be later drawn by Apprendi between discretionary "factors relating both to offense and the offender" that judges may constitutionally consider "in imposing a judgment within the range prescribed by statute" (Apprendi supra, 530 U.S. at p. 481, 120 S.Ct. 2348), and unconstitutional consideration of factors that mandate imposition of a sentence greater than the maximum sentence authorized by the jury's verdict.
Second, the Fowler court cited People v. Lucky (1988) 45 Cal.3d 259, 247 Cal.Rptr. 1, 753 P.2d 1052, former California Rule of Court 4.21(b)[9] (now 4.421), United States v. Williams (9th Cir.1989) 891 F.2d 212, certification denied (1993) 494 U.S. 1037, 110 S.Ct. 1496, 108 L.Ed.2d 631, United States v. Johnson (D.C.Cir.1994) 28 F.3d 151, and McCuttough v. Singletary (11th Cir.1992) 967 F.2d 530, certification denied (1993) 507 U.S. 975, 113 S.Ct. 1423, 122 L.Ed.2d 792, to support the proposition that juvenile adjudications may be used to enhance a sentence in excess of the statutory maximum sentence authorized by the jury's verdict. However, with the exception of McCullough v. Singletary, none of these examples in fact provides any such support. In People v. Lucky, the facts pertaining to violent juvenile misconduct were tried to the jury. The juvenile adjudication itself was not considered relevant. (Lucky, at p. 296 & fn. 24, 247 Cal.Rptr. 1, *550 753 P.2d 1052.) California Rule of Court 4.421, which sets forth factors that may justify the imposition of the aggravated term, regulates the court's exercise of discretion within the statutory range, not outside it. (Cf. People v. Black (2005) 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 113 P.3d 534 [California's Determine Sentencing Law is constitutional].) In both United States v. Williams and United States v. Johnson, the defendants were given sentences within the normal range of the federal sentencing guidelines. Furthermore, to the extent that the federal sentencing guidelines mandate a sentence outside the normal range based on any factor (other than a prior conviction), the federal sentencing guidelines have been found unconstitutional. (Booicer, supra, 543 U.S. at pp. 243,278,125 S.Ct. 738.)
Only McCullough v. Singletary supports the Fowler court's reasoning. That case involved a constitutional challenge in federal court to Florida's habitual offender law which, like our Three Strikes law, permits enhancement of a sentence up to imposition of a life term on the basis of prior juvenile adjudications. However, since McCullough, the federal courts have split on the question of whether a juvenile adjudication falls within Apprendi's exception for prior convictions, although the Eleventh Circuit agrees with the view that they do. (See United States v. Burge, supra, 407 F.3d 1.183.)
Third, the Fowler court relied on language in Almendarez-Torres that "referred to recidivism as a question going to punishment only." (Fowler, supra, 72 Cal. App.4th at p. 586, 84 Cal.Rptr.2d 874, fn. 2) But the fact that recidivism goes to punishment only does not necessarily insulate it from constitutional scrutiny under the Sixth Amendment. According to Apprendi the court had "made clear beyond peradventure that Winship's due process and associated jury protections extend, to some degree, to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence.'" (Apprendi supra, 530 U.S. at p. 484, 120 S.Ct. 2348, italics added.) The language in Almendarez-Torres then does not resolve the question before uswhether a juvenile adjudication is, for all intents and purposes, the equivalent of a prior conviction that can be used to enhance a sentence beyond the maximum established by a jury's verdict.
Our final objection to Fowler's reliance on recidivism as the last word on the constitutional acceptability of using juvenile adjudications to enhance adult sentences under the Three Strikes law is that it assumes the existence of a juvenile adjudication proves recidivismthat the adjudication is a constitutionally adequate marker of "the defendant's conduct," and "demonstrates beyond a reasonable doubt [citation] that a defendant has engaged in serious criminal behavior in the past." (Fowler, supra, 72 Cal.App.4th at pp. 584, 587, 84 Cal.Rptr.2d 874; People v. Bowden, supra, 102 Cal.App.4th at p. 390, 125 Cal.Rptr.2d 513.) For as Lucky teaches us (albeit in a different statutory context), and Fowler implicitly recognizes, "[i]t is not the adjudication, but the conduct itself, which is relevant." (People v. Lucky, supra, 45 Cal.3d at p. 295, fn. 24, 247 Cal. Rptr. 1, 753 P.2d 1
052.)
This brings us to the second and third rationales underlying our fellow courts' majority opinions: that a jury adds nothing to the reliability of fact-finding, and that the jury trial right is not indispensable to the constitutional acceptability of facts that authorize the imposition of sentences in excess of the statutory maximum for a given offense.

*551 (2) Reliability

The notion that juries add nothing to the reliability of juvenile adjudications stems from the following language in McKeiver: "[t]he Court specifically has recognized by dictum that a jury is not a necessary part even of every criminal process that is fair and equitable. Duncan v. Louisiana, [supra,] 391 U.S., at [pp.] 149-150, fn. 14[, 88 S.Ct. 1444], and ... [¶] [t]he imposition of the jury trial on the juvenile court system would not strengthen greatly, if at all, the fact-finding function." (McKeiver v. Pennsylvania, supra, 403 U.S. at p. 547, 91 S.Ct. 1976.) Relying on this language, our colleagues have reasoned that if a jury adds nothing to the reliability of the factfinding function, a juvenile adjudication without a jury is just as reliable as a criminal conviction with a jury trial. Since juveniles can be constitutionally adjudicated as delinquents without a jury trial, "there is no constitutional impediment" to using juvenile adjudications "to increase a defendant's sentence following a later adult conviction." (Fowler, supra, 72 Cal. App.4th at p. 586, 84 Cal.Rptr.2d 874, fn. omitted; People v. Bowden, supra, 102 Cal.App.4th at p. 391-392, 125 Cal.Rptr.2d 513 [quoting Fowler]; People v. Lee, supra, 111 Cal.App.4th at p. 1316, 4 Cal. Rptr.3d 642 [same]; Andrades, supra, 113 Cal.App.4th at pp. 830-831, 7 Cal.Rptr.3d 74 [same].) Put slightly differently, "[W]hen a juvenile receives all the process constitutionally due at the juvenile stage, there is no constitutional problem (on which Apprendi focused) in using that adjudication to support a later sentencing enhancement." (Bowden, at p. 394, 125 Cal.Rptr.2d 513, quoting from United States v. Tighe, supra, 266 F.3d at p. 1200 (dis. opn. of Brunetti, J.); Lee, at p. 1316, 4 Cal.Rptr.3d 642.)
Our disagreement with this reasoning is two-fold. First, it is not necessary to denigrate the accuracy of the jury as fact finder or the importance of the jury in Anglo-American criminal law in order to justify juryless juvenile adjudications. McKeiver identified no fewer than 13 reasons why the jury trial right should not be superimposed on the juvenile court system. Most of those reasons pertain to the nature of the juvenile court system, with its parens patriae rationale, emphasis on therapeutic and rehabilitative dispositions and recognition that children are different from adults and should be treated differently in certain respects. These reasons alone are more than adequate to support the continued vitality of the McKeiver court's holding that due process does not require the superimposition of a jury trial on the juvenile court system.[10]
*552 Second, unlike the McKeiver court's conclusion that the juryless juvenile court system continues to serve valid ends, its conclusion that in our legal system the jury is not, in any event, "a necessary component of accurate fact-finding'' has not been borne out by subsequent developments in the law. (McKeiver v. Pennsylvania, supra, 403 U.S. at p. 543, 91 S.Ct. 1976.) While the McKeiver court "saw no particular magic in a 12-man jury for a criminal case" (ibid., citing Williams v. Florida (1970) 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446), in 1978, the court concluded, based on empirical studies, that in fact the accuracy of the fact-finding function in criminal cases was intolerably impaired, from-the standpoint of the Sixth Amendment, when juries; were composed of fewer than six persons. (Ballew v. Georgia (1978) 435 U.S. 223, 232-233, 98 S.Ct. 1029, 55 L.Ed.2d 234.) The court observed that "[w]hen individual and group decisionmaking were compared, it was seen that groups performed better because prejudices of individuals were frequently counterbalanced, and objectivity resulted." (Id. at p. 233, 98 S.Ct. 1029.) In particular, "the data now raise doubts about the accuracy of the results achieved by smaller and smaller panels. Statistical studies suggest that the risk of convicting an innocent person (Type I error) rises as the size of the jury dimimshes. Because the risk of not convicting a guilty person (Type II error) increases with the size of the panel, an optimal jury size can be selected as a function of the interaction between the two risks. Nagel and Neef concluded that the optimal size, for the purpose of minimizing errors, should vary with the importance attached to the two types of mistakes. After weighing Type I error as 10 times more significant than Type II, perhaps not an unreasonable assumption, they concluded that the optimal jury size was between six and eight. As the size diminished to five and below, the weighted sum of errors increased because of the enlarging risk of the conviction of innocent defendants." (Id at p. 234, 98 S.Ct. 1029, fns. omitted.) The court also noted that one study of judge-jury disagreement in civil cases revealed a 22 percent disparity in case-by *553 case comparisons.[11]
The lesson we draw from Ballew and McKeiver is not that judicial fact-finding is unreliableclearly, it is reliable enough to afford due process where juvenile dispositions are the outcome of the adjudicative processbut that, in the absence of a jury waiver, only jury fact-finding by six or more persons deliberating together is reliable enough to afford due process in nonpetty criminal cases, where the outcome of the adjudicative process is imprisonment.
Thus, in our view, it is no answer to Ballew or Apprendi to say that the Three Strikes law "has not transformed juvenile adjudications into criminal convictions; it simply has said that, under specified circumstances, a prior juvenile adjudication may be used to as evidence of past criminal conduct for the purpose of increasing an adult defendant's sentence. The Three Strikes law's use of juvenile adjudications affects only the length of the sentence imposed on an adult offender, not the finding of guilt in the adult court nor the adjudication process in the juvenile court." (Fowler, supra, 72 Cal.App.4th at p. 586, 84 Cal.Rptr.2d 874; People v. Bowden, supra, 102 Cal.App.4th at pp. 391-392, 125 Cal.Rptr.2d 513; Andrades, supra, 113 Cal.App.4th at pp. 830-831, 7 Cal.Rptr.3d 74; People v. Lee, supra, 111 Cal.App.4th at pp. 1312-1313, 4 Cal.Rptr.3d 642; People v. Smith, supra, 110 Cal.App.4th at p. 1079, 1 Cal.Rptr.3d 901.)
Whenever the length of a sentence imposed on an adult offender is involved, the case is by definition criminal, and it implicates the Sixth Amendment's right to a jury trial. When the Three Strikes law uses the fact of a prior juvenile adjudication to enhance a sentence, it is doing so for the purpose of enhancing an adult defendant's sentence, and it is bound by the rules that govern criminal cases. One of those rules is that a criminal sentence must reflect the judgment of a jury of at least six members, even if it is a prior conviction, unless that jury is waived. By letting a juvenile adjudication "stand in" for "evidence of past criminal conduct" the law is relying on the judgment of a fact finder that is constitutionally unacceptable in a criminal case in the absence of the defendant's waiver. We think the Louisiana Supreme Court expressed our views best when it said, "`there remains a great disparity in the severity of penalties faced by a juvenile charged with delinquency and an adult defendant charged with the same crime.' [Citation.] ... [¶] ... [¶] ... The determination that a jury trial was not constitutionally required in juvenile *554 adjudications was predicated upon the non-criminal treatment of the adjudicated juvenile delinquent. [Citation.] It would be incongruous and illogical to allow the non-criminal adjudication of a juvenile delinquent to serve as a criminal sentencing enhancer. To equate this adjudication with a conviction as a predicate offense for purposes Of the Habitual Offender Law would subvert the civil trappings of the juvenile adjudication to an extent to make it fundamentally imfair and thus, violative of due process. In order to continue holding a trial by jury is not constitutionally required, we cannot allow these adjudications, with their civil trappings, to be treated as predicate offenses the same as felony convictions. It seems contradictory and fundamentally unfair to provide youths with fewer procedural safeguards in the name of rehabilitation and then to use adjudications obtained for treatment purposes to punish them more severely as adults. [Citation] It is inconsistent to consider juvenile adjudications civil for one purpose and therefore not constitutionally entitled to a jury trial, but then to consider them criminal for the purpose of classifying them as `prior convictions,' which can be counted as predicate offenses for purposes of the Habitual Offender Law." (State v. Brown, supra, 879 So.2d at p. 1289, fn. omitted.)

(3) Indispensability
To the extent that McKeiver's language is interpreted as suggesting that the jury is not indispensable to the criminalas opposed to the juveniletrial, it is either misunderstood or inconsistent with Duncan and its progeny, of which Apprendi and Blakely are surely two. As Mr. Justice Blackmun, the author of the lead opinions in both Ballew and McKeiver wrote in Ballew, "[t]he Court in Duncan applied th[e] Sixth Amendment right [to jury trial in nonpetty criminal cases] to the States because `trial by jury in criminal cases is fundamental to the American scheme of justice.'" (Ballew v. Georgia, supra, 435 U.S. at p. 229, 98 S-Ct. 1029; see also Sullivan v. Louisiana (1993) 508 U.S. 275, 281-282, 113 S.Ct. 2078, 124 L.Ed.2d 182.)
This is because, besides enhancing the accuracy of fact-finding, the jury serves other purposes of paramount importance in criminal cases: "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants' `in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge: If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official powera reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence. The deep commitment *555 of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due Process Clause of the Fourteenth Amendment, and must therefore be respected by the States." (Duncan v. State of Louisiana, supra, 391 U.S. at pp. 156-156, 88 S.Ct. 1444, fn. omitted.)[12]
Apprendi described the right to a jury trial as a constitutional protection "of surpassing importance" and found New Jersey's sentencing scheme "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." (Apprendi supra, 530 U.S. at pp. 476-477, 497, 120 S.Ct. 2348, italics added.) The Blakely court emphasized that the jury trial right "is no mere procedural formality, but a fundamental reservation of power in our constitutional structure." (Blakely, supra, 542 U.S. at pp. 305-306, 124 S.Ct. 2531.) It characterized the jury's intended control over the judiciary as a "circuitbreaker in the State's machinery of justice." (Id, at p. 306, 124 S.Ct. 2531.)
In the face of such powerful language, we are at a loss to understand how our colleagues can say that "Jones does not support [the] broad conclusion ... that the jury trial right is an indispensable part of `a fundamental triumvirate of procedural protections intended to guarantee the reliability of criminal convictions'" (Bowden, supra, 102 Cal.App.4th at p. 393, 125 Cal. Rptr.2d 513, quoting from United States v. Tighe, supra, 266 F.3d at p. 1193; People v. Lee, supra, 111 Cal.App.4th at p. 1316,4 Cal.Rptr.3d 642) or that Apprendi did not identify the jury trial right as "`one of the requisite procedural safeguards' necessary for a prior conviction to be exempt from its rule." (Lee, at p. 1314, 4 Cal.Rptr.3d 642.)
In Jones, the court distinguished Almendarez-Torres by saying that "unlike virtually any other consideration used to enlarge the possible penalty for an offense, and certainly unlike the factor before us in this case, a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt and jury trial guarantees." (Jones v. United States, supra, 526 U.S. at p. 249, 119 S.Ct. 1215.) It is true that the court in Apprendi did not quote this language from Jones. But it did say that Jones "foreshadowed" its decision in Apprendi and it cited to the Jones's discussion in of the historical roots of the jury in Anglo-American jurisprudence throughout its opinion. (Apprendi supra, 530 U.S. at p. 476,120 S.Ct. 2348.)
More importantly, "the Apprendi court had this to say about why the State's reliance on Almendarez-Torres was misplaced: "The reasons supporting an exception from the general rule for the statute construed in that case do not apply to the New Jersey statute. Whereas recidivism `does not relate to the commission of the offense' itself ..., New Jersey's biased purpose inquiry goes precisely to what happened in the `commission of the offense.' Moreover, there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require *556 the prosecutor to prove guilt beyond a reasonable doubt;, and allowing the judge to find the required fact under a lesser standard of proof." (Apprendi supra, 530 U.S. at p. 496, 120 S.Ct. 2348.)
It is that "vast difference" which, in the end, persuades us that even a judgment reflecting recidivism, rather than facts pertaining to the commission of the offense, must have been entered in a proceeding in which the defendant had a right to a jury trial, not only the right to require the prosecutor to prove guilt beyond a reasonable doubt. We have no doubt that the rights afforded juveniles "`are more than sufficient to ensure the reliability'" that is required to support a disposition in juvenile court, but we are not convinced that those rights are "`sufficient to ensure the reliability that Apprendi requires'" in a criminal case. (People v. Lee, supra, 111 Cal.App.4th p. 1315, 4 Cal.Rptr.3d 642, quoting from Smoiley, supra, 294 F.3d at p. 1032; see also Andrades, supra, 113 Cal.App.4th at p. 832, 7 Cal.Rptr.3d 74.) In our view, using a juvenile adjudication to enhance the sentence in a criminal case is a constitutionally impermissible use of a nonjury judgment to prove the fact of recidivism under Apprendi
Our colleagues point out that California law requires pleading and proof of prior convictions and juvenile adjudications in the current case, and gives the defendant a Statutory right to a jury trial on the question whether he or she suffered the prior conviction, and they conclude that the provision of these rights solves any constitutional problem posed by Apprendi. (People v. Bowden, supra, 102 Cal.App.4th at pp. 392-393, 125 Cal.Rptr.2d 513; People v. Lee, supra, 111 Cal.App.4th at pp. 1315, 1316, 4 Cal.Rptr.3d 642; People v. Smith, supra, 110 Cal.App.4th at p. 1079, 1 Cal. Rptr.3d 901; Andrades, supra, 113 Cal. App.4th at pp. 833-834, 7 Cal.Rptr.3d 74.) The Lee majority noted that Tighe itself had distinguished California law on this basis. (Lee, at p. 1316, 4 Cal.Rptr.3d 642, quoting United States v. Tighe, supra, 266 F.3d at p. 1192, fn. 3; see also Andrades, at p. 834, 7 Cal.Rptr.3d 74.)
Because we believe that the defendant must have had the opportunity to prove the contested facts underlying the prior juvenile judgment to a jury, we disagree with our colleagues' conclusion that pleading and proof requirements, and the type of jury trial provided by Penal Code section 1025,[13] solve the constitutional problem we perceive. In our view, there is a vast difference between proving to a jury that the defendant once suffered a juvenile adjudication, and proving to a jury, from contested facts, that the defendant actually committed the criminal conduct underlying the juvenile adjudication of delinquency that makes him a recidivist. "It is not the adjudication, but the conduct itself, which is relevant." (People v. Lucky, supra, 45 Cal.3d at p. 295, fn, 24, 247 Cal. Rptr. 1, 753 P.2d 1052.)

Remedy
With one caveat, the only constitutional solution to this problem, as we see it, is to *557 hold that juvenile adjudications do not come within Apprendi's exception for prior convictions because, unlike prior convictions, juvenile adjudications are not entered in a proceeding in which the defendant had the right to a jury trial. The caveat is that a juvenile adjudication can be used, without offending the constitution, if it is based on the defendant's admission. Apprendi made clear that Almendarez-Torres' failure to challenge the accuracy of the prior conviction allegations eased the constitutional tension that might otherwise have existed had the facts been contested, and Blakely unequivocally held that because the facts supporting the exceptional sentence in that case were "neither admitted by the [defendant] nor found by the jury," the sentence could not stand. (Blakely, supra, 542 U.S. at p. 303, 124 S.Ct. 2531.) The implication from Apprendi and Blakely is that if the defendant made a judicial admission of the underlying conduct that supports the court's finding of recidivism, that admission is sufficiently reliable to support an enhanced sentence based on the court's finding of the admitted fact.
In the case before us, defendant admitted the commission of the offense that resulted in his juvenile adjudication. Therefore, Apprendi and Blakely do not prohibit the use of his juvenile adjudication to enhance his sentence pursuant to the Three Strikes law.

CONCLUSION
Today we hold that a juvenile adjudication is not a prior conviction within the meaning of Apprendi because the juvenile offender does not have the right to a jury trial. Therefore, a contested juvenile adjudication cannot be used, pursuant to the Three Strikes law, to impose on an adult a sentence in excess of the maximum sentence that could have been imposed on the basis of a trial or a defendant's admission.
It is equally important to note what we do not hold. We do not hold that juveniles are entitled to jury trials. That question has already been decided by both the United States and California supreme courts. (In re Daedler (1924) 194 Cal. 320, 228 P. 467; McKeiver v. Pennsylvania, supra, 403 U.S. 528, 91 S.Ct. 1976.) We are bound by those decisions, and nothing we say here today is meant to intimate our disagreement with them. Moreover, our decision today will never affect the vast majority of juveniles who commit the most serious crimes and whose cases are transferred to adult court for resolution. (§ 707, subds. (b) & (d).) Nor will it disturb the discretionary sentencing decisions of courts who consider an adult defendant's juvenile offenses in order to choose a sentence within the normal sentencing range. (People v. Black, supra, 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 113 P.3d 534; Cal. Rules of Court, rule 4.421.) Our ruling has no application outside the subset of adult offenders who, as 16 and 17 year olds, were accused of committing crimes that were not considered so serious at the time as to warrant transfer to adult court, and were adjudicated as guilty of those crimes after contested court trials, and whose resulting adjudications are used to justify sentences in excess of the maximum sentence that could have been imposed as a result of a court or jury trial, or an admission, in adult court.
However, because defendant's juvenile adjudication in this case resulted from a judicial admission of the conduct that resulted in the adjudication, we hold that his sentence under the Three Strikes law was constitutionally imposed.

DISPOSITION
The judgment is affirmed.
*558 RUSHING, P.J., concurs,
MIHARA, J., concurs in judgment only.
NOTES
[1] Because the documents submitted to the court were not made a part of the record on appeal, and were subsequently lost, we take judicial notice of the juvenile court file on our own motion.
[2] See, for example. In re Gault (1967) 387 U.S. 87 S.Ct. 1428, 18 L.Ed.2d 527 fair notice of the charges; counsel, testimony by sworn witnesses, privilege against self incrimination!; In re Winship (1970) 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 [proof beyond a reasonable doubt]; Breed v. Jones (1975) 421 U.S. 519, 95 S.Ct 1779, 44 L.Ed.2d 346 [double jeopardy].
[3] In fact, Duncan's footnote 14 stands for the opposite-proposition: that even though "it might be; said"-that the right to a jury trial is not essential to every imaginable civilized system of criminal justice, nevertheless it is "necessary to an Anglo-American regime of ordered liberty," (Duncan v. Louisiana, supra, 391 U.S. at pp. 149-150, fn. 14, 88 S.Ct. 1444.) The Duncan court specifically "reject[ed] the prior dicta" in Palko v. State of Connecticut (1937) 302 U.S. 319, 325, 58, S.Ct. 149, 82 L.Ed. 288, overruled on another point in Benton v. Maryland (1969) 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707, and other cases to the effect that "the right to a jury trial is not essential to ordered liberty." (Duncan v. Louisiana, at p. 155, 88 S.Ct. 1444.)
[4] Hereafter, all statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.
[5] Section 202 provides, in relevant part: "(a) The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public. When removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective. When the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents. This chapter shall be liberally construed to carry out these purposes. [¶] (b) Minors under the jurisdiction of the juvenile court who are in need of protective services shall receive care, treatment and guidance consistent with their best interest and the best interest of the public. Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter. If a minor has been removed from the custody of his or her parents, family preservation and family reunification are appropriate goals for the juvenile court to consider when determining the disposition of a minor under the jurisdiction of the juvenile court as a consequence of delinquent conduct when those goals are consistent with his or her best interests and the best interests of the public. When the minor is no longer a ward' of the juvenile court, the guidance he or she received should enable him or her to be a law-abiding and productive member of his or her family and the community. [¶] ... [¶] (d) Juvenile courts and other public agencies charged with enforcing, interpreting, and administering the juvenile court law shall consider the safety and protection of the public, the importance of redressing injuries to victims, and the best interests of the minor in all deliberations pursuant to this chapter. Participants in the juvenile justice system shall hold themselves accountable for its results.... [¶] (e) As used in [subdivision (b)], `punishment' means the imposition of sanctions.... Permissible sanctions may include the following: [¶] (1) Payment of a fine by the minor. [¶] (2) Rendering of compulsory service without compensation performed for the benefit of the community by the minor. [¶] (3) Limitations on the minor's liberty imposed as a condition of probation or parole. [¶] (4) Commitment of the minor to a local detention or treatment facility, such as a juvenile hall, camp, or ranch. [¶] (5) Commitment of the minor to the Department of the Youth Authority, [¶] `Punishment,' for the purposes of this chapter, does not include retribution."
[6] See Article I, section 28(f) of the California Constitution which states in relevant part: "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of the sentence: in any criminal proceeding."
[7] See Note and Comment, A Tale of Three Strikes: Slogan Triumphs Over Substance as Our Bumper-Sticker Mentality Comes Home to Roost (1995) 28 Loyola L.A. L.Rev. 1047; Comments, Juvenile Justice and the Punishment 6f Recidivists Under California's Three Strikes Law (2002) 90 Cal. L.Rev. 1157; Recent Cases, Constitutional LawRight to Jury TrialEighth Circuit Holds An Adjudication of Juvenile Delinquency to Be a "Prior Conviction" for the Purpose of Sentence Enhancement at a Subsequent Criminal Proceeding-United States v. Smalley, 294 F.3d 1030 (8th Cir.2002) (2002) 116 Harv. L.Rev. 705; Feld, The Constitutional Tension Between Apprendi and McKeiver: Sentence Enhancements Based on: Delinquency Convictions and the Quality of Justice in Juvenile Courts (2003) 38 Wake Forest L.Rev. 1111; Comment, Calif. Three Strikes Law, supra, 32 San Diego L.Rev. 1297; Comment, Prior Convictions Under Apprendi, supra, 87 Marq. L.Rev. 573; Murphy, The Use of Prior Convictions after Apprendi (2004) 37 U.C. Davis L.Rev. 973; Marrus, "That Isn't Fair, Judge": The Costs of Using Prior Juvenile Delinquency Adjudications in Criminal Court Sentencing (2004) 40 Hous. L. Rev 1323; Note, Juvenile Strikes, supra, 15 So. Cal. L.Rev. & Women's Stud. 171; Notes, Should Juvenile Adjudications Count as Prior Convictions For Apprendi Purposes? (2004) 45 Wrn. & Mary L.Rev. 1159; Note, Kid, supra, 26 Cardozo L.Rev. 837; Notes, The Use of Juvenile Adjudications Under the Armed Career Criminal Act (2005) 85 B.U.L.Rev. 263; Note, The Problem with Forgiving (But Not Entirely Forgetting) the Crimes of Our Nation's Youth: Exploring the Third Circuit's Unconstitutional Use of Nonjury Juvenile Adjudications in Armed Career Criminal Sentencing (2005) 66 U. Pitt. L.Rev. 887.

Our research has uncovered only one law review article favoring the use of juvenile adjudications to enhance adult sentences. Notes & Comments, Should Little Joey's Juvenile Adjudication Be Used Against Him When he Becomes Joe the Habitually Violent Felon?, supra, 25 J. Juv. L. 45.
[8] Black's Law Dictionary (8th ed.2004) defines recidivism as "[a] tendency to relapse into a habit of criminal activity or behavior."
[9] Former California Rule of Court 4.21, renumbered 4.421 effective January 1, 2001, and effective January 1, 2007, provides, in relevant part: "Circumstances in aggravation include facts relating to the crime and facts relating to the defendant. [11]... TO (b) Facts relating to the defendant include the fact that: [¶] . .. [¶] (2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness...."
[10] Indeed, the concerns that animated the creation of a separate juvenile court system, as well as McKeiver's refusal to dismantle it, continue to inform the way we, as a society, view juveniles, even those who commit heinous crimes. As Justice Kennedy so eloquently stated in support of the court's decision that the constitution prohibits the execution of persons who committed capital crimes when they were juveniles between the ages of 16 and 18, "Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, as any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, `[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' [Citations.] [¶] The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. [Citation.] This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. [Citation.] [¶] The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. [Citation.] [¶] These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means `their irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation.] Their Own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. [Citation.] The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by -a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, `[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' [Citation.] [f] ... [11] Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn.... The age of 18 is the point where society draws the line for many purposes between childhood and adulthood." (Roper v. Simmons (2005) 543 U.S. 551, 569-574, 125 S.Ct. 1183, 161 L.Ed.2d 1.)
[11] Although not cited in Ballew (but see Duncan v. State of La., supra, 391 U.S. at p. 157 fns. 24 & 26, 88 S.Ct. 1444,), the same authors "analyzed a sample of bench and jury trials, comparing juries' actual verdicts with judges' hypothetical verdicts. They discovered that juries are 16% more lenient than judges.... One explanation that Kalven and Zeisel offered for this phenomenon is that judges and juries differ over issues of fact because they have `different standards of reasonable doubt [and] different thresholds for the proof required for conviction in the criminal case.'" (Juvenile Strikes, supra, 15 So. Cal. Rev. L. & Women's Stud, at p. 189, fns. omitted, citing Kalven & Seizel, The American Jury (1966).) The author of a 1983 report on juvenile justice to the California Legislature found that "`arrest disposition patterns suggest it is easier to win a conviction in the juvenile court than in the criminal court.'" (Juvenile Strikes, at p. 189, citing Greenwood et al., Youth Crime and Juvenile Justice in California: A Report to the Legislature (1983); see also The Problem with Forgiving, supra, 66 U. Pitt. L.Rev. 887, 905-906 ["a youth tried in juvenile court is more likely to be found delinquent by a judge than if tried by a detached jury, as in an adult criminal proceeding, based on the same evidence"], citing Feld, Justice for Children: The Right to Counsel and the Juvenile Courts (1993) p. 271.)
[12] By recognizing that "a general grant of jury trial for serious offenses is a fundamental right, essential for preventing miscarriages of justice and for assuring that fair trials are provided for all defendants," the Duncan court was careful not to "cast doubt on the integrity" of bench trials, and expressly stated it held "no constitutional doubts about the practices, common in both federal and state courts, of accepting waivers of jury trial and prosecuting petty crimes without extending a right to jury trial." (Duncan v. Louisiana, supra, 391 U.S. at pp. 157-158, 88 S.Ct. 1444, fns. omitted.)
[13] Penal Code section 1025 provides in relevant part: "(a) `When a defendant who is charged in the accusatory pleading with having suffered a prior conviction pleads either guilty or not guilty of the offense charged against him or her, he or she shall be asked whether he or she; has suffered the prior conviction.... [¶] (b) Except as provided in subdivision (c), the question of whether or not the defendant has suffered the prior conviction shall be tried by the jury that tries the issue upon the plea of riot guilty,'or in the case of a plea of guilty or nolo contendere, by a jury impaneled for that purpose, or by the court if a jury is waived. [¶] (c) Notwithstanding the provisions of subdivision (b), the question of whether the defendant is the person who has suffered the prior conviction shall be tried by the court without a jury."